IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

BRIAN CHURCH
    Defendant.

Criminal No.: ELH-17-322

## MEMORANDUM OPINION

Brian Church, defendant, was convicted in June 2018 of conspiracy to distribute heroin and fentanyl, for which he is serving a sentence of forty-six months' imprisonment at FCI Allenwood Low. ECF 260. While self-represented, Church filed a motion for compassionate release. ECF 362. Then, through counsel, he again moved for compassionate release, pursuant to 18 U.S.C. 3582(c)(1)(A)(i) (ECF 394), supported by a memorandum of law (ECF 394-1) and exhibits. I shall refer to ECF 362, ECF 394, and ECF 394-1 collectively as the "Motion." The government's opposition is docketed at ECF 396 and is supported by exhibits. Defendant replied (ECF 399) and subsequently submitted a supplement (ECF 403) and an additional exhibit (ECF 410).

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall deny the Motion.

### I. Background

Pursuant to a Superseding Indictment, Church was indicted on September 6, 2017, along with ten others. ECF 21. He was charged in Count One with conspiracy to distribute and possess with intent to distribute heroin and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 846. *Id.*

Church entered a plea of guilty to Count One of the Superseding Indictment on June 25, 2018 (ECF 193), pursuant to a Plea Agreement. ECF 194.[1] In the Plea Agreement, the parties contemplated a base offense level of 22, before deductions for acceptance of responsibility. *Id.* ¶ 6. There was no agreement as to defendant's criminal history.

The Plea Agreement included a stipulation of facts. *Id.* at 9. According to the stipulation, during 2016 and 2017 law enforcement investigated a drug conspiracy that involved transporting narcotics into Maryland from out of state and distributing them in the Baltimore area. *Id.* Church, who lived in New York, was a participant in the conspiracy. *Id.*

Pursuant to an authorized wiretap, investigators monitored a series of conversations that took place during April 2017 between Church and "CC1," a drug dealer based in Maryland. *Id.* The two arranged for other members of the conspiracy, including "CC2," to travel from Maryland to New York to purchase narcotics from Church. *Id.* Based on those intercepted exchanges, investigators set up surveillance at a location in New York on or around April 7, 2017. *Id.* They observed Church "getting into a vehicle with Maryland license plates . . . in which CC2 was sitting." After stopping the vehicle and detaining its occupants,[2] investigators conducted a search of Church's person. They recovered eighty-seven grams of heroin. *Id.* Defendant stipulated that he knowingly possessed that heroin and that he knowingly conspired to distribute it to CC2, among others, who in turn intended to distribute it within Maryland. *Id.*

---

[1] A Second Superseding Indictment was filed on February 6, 2018, which charged defendant with the same crime. ECF 111. It was eventually dismissed as to defendant. *See* ECF 260. The Presentence Report erroneously states that the defendant pled guilty to Count One of the Second Superseding Indictment. *See* ECF 221, ¶ 2.

[2] The location of the stop is not specified in the Stipulation.

According to the Presentence Report (ECF 221, the "PSR"), Church had a final offense level of 19, *id.* ¶ 25, and a criminal history category of IV. *Id.* ¶ 41. The Sentencing Guidelines ("U.S.S.G." or "Guidelines") called for a period of imprisonment ranging from forty-six to fifty-seven months. *Id.* ¶ 81.

The PSR reflects that defendant has a long criminal history, *id.* ¶¶ 28-38, dating to 1977. *Id.* ¶ 28. Defendant's record includes prior federal convictions in 2006 for two offenses: possession with intent to distribute heroin and felon in possession of a firearm. *Id.* ¶ 37. And, defendant committed the instant offense while on supervised release for those offenses. *Id.* ¶¶ 37, 40.

Several of the offenses listed in the PSR did not score points. *See id.* Of pertinence here, in 1992 Church was convicted in New York on seven counts: Four counts of drug possession; possession of a weapon; use of drug paraphernalia; and resisting arrest. *Id.* ¶ 35. He received concurrent sentences of ten years to life imprisonment on one drug possession count; eight to sixteen years' imprisonment on the other three drug possession counts; and lesser sentences on the other charges. *Id.* Defendant was paroled in 2002. *Id.* Six years later, in 2006, defendant pleaded guilty in this Court to the two offenses noted above: possession with intent to distribute heroin and to being a felon in possession of a firearm. *Id.* ¶ 37. Judge Motz sentenced Church to concurrent terms of ninety-eight months' imprisonment. *Id.* Defendant was released in late 2013. *Id.* And, as mentioned, this offense occurred while Church was on supervised release

Sentencing in this case was held on October 19, 2018. ECF 259. At that time, Church was fifty-seven years of age. *See* ECF 221 at 2. The PSR reflected that he reported a history of marijuana use, including daily use for a period of time, and requested "consideration for RDAP," *i.e.*, the residential drug abuse program. *Id.* ¶ 72; *see id.* ¶ 73.

The government recommended a sentence of fifty-seven months' incarceration. ECF 254 at 4. But, I imposed a sentence of forty-six months' imprisonment, followed by three years of supervised release. ECF 260. And, I allowed Church to surrender on January 7, 2019, to begin serving his sentence. *Id.*

Church is serving his sentence at FCI Allenwood Low. ECF 394-1 at 2; ECF 396 at 6. There is no indication that defendant has committed any disciplinary infractions while incarcerated. Moreover, he completed the residential portion of the RDAP program in October 2020. ECF 410. At that time, he was deemed eligible to move forward with other components of the program. *Id.*

The submissions from both sides indicate that defendant has a projected release date of May 22, 2022. ECF 394-2 at 3; ECF 396 at 9; *see also Find an inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited June 10, 2021). The defendant has served approximately 65% of his sentence and, when accounting for good time credit, he has served approximately 73% of his sentence. Defendant asserts that he did not receive good time credit for completion of the RDAP program, as he should have. ECF 403. Notably, he is eligible for home detention on January 3, 2022. EF 394-2 at 3.

If released, Church plans to live in New York City with Charlene Hall, with whom he has been friends for forty-five years. ECF 294-1 at 8. And, he "plans to return to work for the New York State Board of Elections." ECF 403 at 2.

Church submitted a request for compassionate release to the Warden in December 2020. *See* ECF 394-2 at 2. That request was promptly denied. *Id.*

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed."

4

18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. Section 3582 was adopted as part of the Sentencing Reform Act of 1984. It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA"). *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of

the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

(i) extraordinary and compelling reasons warrant such a reduction;

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release. *See McCoy*, 981 F.3d at 276. The Sentencing

Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)   **Medical Condition of the Defendant**.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
>   (I)   suffering from a serious physical or medical condition,
>
>   (II)  suffering from a serious functional or cognitive impairment, or
>
>   (III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence. Application Note 1(C) concerns Family Circumstances. Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement. Rather, the Court must consider the Sentencing Commission's policy statements. *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"). However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act. Thus,

it is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). In other words, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at 282; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826-27; *see also United States v. Kibble*, 992 F.3d 326, 329-30 (4th Cir. 2021) (per curiam) (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable);

*United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). But, compassionate release is a "rare" remedy. *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III. COVID-19[3]

Defendant first sought compassionate release in August 2020. He filed another motion in January 2021. At those times, the nation was "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[4] The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the

---

[3] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[4] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis.

The virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. Many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

The virus continues to afflict those residing in countries around the world. But, in recent weeks, this country has seen a considerable reduction in new cases. Nonetheless, as of June 16, 2021, COVID-19 has infected more than 33.5 million Americans and caused approximately 600,000 deaths in this country. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed May 7, 2021). Although new COVID-19 cases are reported every day, the numbers are far below what we saw earlier, and with far fewer deaths.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, July 17, 2020, and November 2, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. On March 29, 2021, to reflect the most recently available data, the CDC again revised its guidance. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 29, 2021), https://bit.ly/38S4NfY. According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; and substance use disorders. *Id.* The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.

*Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces

within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the Bureau of Prisons ("BOP") implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

The Department of Justice ("DOJ") recognized the unique risks posed to inmates and employees of the BOP from COVID-19. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL

3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

Although there is currently no cure for the virus, medical treatments have continued to improve. And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson). Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders. But, the criteria for eligibility has since expanded considerably, and the vaccine is now available to all persons twelve years of age and older. Approximately 52% of the eligible population, and 55% of all persons eighteen years of age and older, is fully vaccinated. *See See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited June 17, 2021). And, 44% of the total U.S. population is fully vaccinated. *See id.*

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of June 10, 2021, the BOP had 129,219 federal inmates and 36,000 staff. And, by that date, the BOP had

administered 191,324 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed June 10, 2021).[5]

As of June 10, 2021, BOP reported that 97 inmates out of a total of 129,219 inmates, and 127 BOP staff out of some 36,000 staff members, currently test positive for COVID-19; 44,925 inmates and 6,851 staff have recovered from the virus; and 238 inmates and four staff members have died from the virus. Moreover, the BOP has completed 114,931 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Allenwood Low, were the defendant is imprisoned, the BOP reported that as of June 10, 2021, out of a total of 890 inmates, none has tested positive. But, two staff members have tested positive for COVID-19, and 269 inmates and 21 staff have recovered at the facility. In addition, 418 staff members and 1,445 inmates at the Allenwood complex have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, *supra*; *FCI Allenwood Low*, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/alf/ (last visited June 16, 2021).

---

[5] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems.*" America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

More recently, on April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

## IV. Discussion

Church has moved for compassionate release on the ground that his medical conditions render him particularly vulnerable to COVID-19. ECF 394-1 at 3-6. In particular, he asserts that he suffers from hypertension, "chronic kidney disease (stage 3)," and "pre-diabetes," among other conditions. *Id.* at 1.

The government concedes that defendant's afflictions "include conditions" that satisfy the "extraordinary and compelling" prong of the § 3582 analysis. ECF 396 at 4. But, the government contends that Church's medical conditions are not "so severe" as to warrant a reduction in his sentence. ECF 396 at 5. In addition, the government points out that in January 2021, defendant declined to receive a COVID-19 vaccine (*id.* at 6), as evidenced by BOP records. ECF 396-3. The reasons for the defendant's decision are not clear. *See* ECF 396 at 6. But, the government asserts that nothing in defendant's medical records "suggest[s] any medical problems associated with receiving" a vaccine. *Id.* Accordingly, in the government's view, Church's rejection of a vaccine "greatly weakens" his contention that his health conditions constitute an extraordinary and compelling circumstance.

The reply does not offer any insight into the reasons underlying Church's decision to refuse the vaccine. Counsel states, ECF 399 at 10: "Mr. Church's reasons as to why he has refrained from receiving the vaccine is unknown . . . ." Nevertheless, defendant maintains that his decision should not count against him. For one, the reply speculates that defendant might not have received "accurate information regarding the risks and benefits of the vaccine," and notes that defendant could have been influenced by "false information." *Id.* Either way, counsel insists that Church "has the right to refuse medical treatment without providing justification for his decisions." *Id.*

17

And, he asserts: "Neither the BOP nor CDC have made the vaccination a requirement for preventative care." *Id.* at 11.

This facile observation is not especially helpful. Defendant overlooks the fact that the CDC describes the COVID-19 vaccines as "safe and effective" and encourages all eligible persons to obtain one. *Key Things to Know about COVID-19 Vaccines*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html (updated Jun. 11, 2021).

Moreover, a growing number of district court judges across the country, including some in the District of Maryland, have reasoned that a prisoner's refusal to obtain a COVID-19 vaccine significantly undermines the claim that his or her susceptibility to the effects of COVID-19 constitutes grounds for compassionate release. As Judge Gallagher recently observed: "Courts now widely recognize that a refusal to take preventative measures to protect oneself from COVID-19 undermines any assertion that the risk of viral infection constitutes an extraordinary and compelling reason justifying release. . . . Any decision to the contrary would create a perverse incentive in favor of declining the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow prison operations to return to some degree of normalcy in the coming months." *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); *see United States v. Dempsey*, 1:19-cr-368 (TNM), 2021 WL 2073350, at *3–4 (D.D.C. May 24, 2021) (reasoning similarly, and noting that the defendant had "the advantage of being represented—and informed of the benefits of vaccination—by counsel," and that by exercising his right to refuse vaccination, the defendant "endanger[ed] himself and those around him"); *United States v. Smith*, SAG-20-47, 2021 WL 1733457, at *2 (D. Md. May 3, 2021) (noting that the defendant did not have any "medical contraindications for vaccination"); *accord*

*United States v. Simpson*, SAG-16-0398, 2021 WL 2260379, at *2 (D. Md. June 3, 2021); *United States v. Cain*, 1:16-CR-00103-JAW, 2021 WL 2269974, at *7 (D. Me. June 3, 2021); *United States v. Brice*, SAG-07-0261, 2021 WL 1926713, at *3 (D. Md. May 13, 2021); *United States v. Ortiz*, 5:18-CR-00264, 2021 WL 1422816, at *4 (E.D. Pa. Apr. 15, 2021); *United States v. Piles*, CR 19-292-5 (JDB), 2021 WL 1198019, at *3 (D.D.C. Mar. 30, 2021) (collecting cases); *United States v. Siegel*, TDC-03-0393, 2021 WL 962491, at *2 (D. Md. Mar. 15, 2021); *United States v. Reynoso*, ___ F. Supp. 3d ___, CR 17-10350-NMG, 2021 WL 950081, at *2 (D. Mass. Mar. 12, 2021).

I find persuasive the reasoning of the decisions that look unfavorably upon a prisoner's refusal to obtain the vaccine. The case of *United States v. Spriggs*, CCB-10-364, 2021 WL 1856667 (D. Md. May 10, 2021), does not lead me to a different conclusion.

*Spriggs* concerned a distinct but related set of circumstances — namely, a movant who *was* vaccinated but nevertheless claimed that his vulnerability to COVID-19 due to health conditions constituted extraordinary and compelling circumstances. There, Judge Blake concluded that "the fact that [the defendant] received a vaccine does not negate that his underlying health conditions make him eligible for compassionate release," and that concluding otherwise "would ignore the remaining unknowns about the protection the vaccine can provide and would create a perverse incentive for prisoners like Spriggs who seek compassionate release on the basis of medical conditions to decline the vaccine for fear it would preclude relief." *Id.* at *3.

In light of what appears to be growing agreement—perhaps even rough consensus—among numerous judges on this issue, coupled with Church's failure to provide an explanation for his refusal of a vaccine, I conclude that his medical conditions do not constitute extraordinary and

compelling circumstances under 18 U.S.C. § 3582. Accordingly, I need not address whether Church poses a danger to the community or the factors set forth in 18 U.S.C. § 3553(a).

### V. Conclusion

For the reasons set forth above, I shall deny the Motion (ECF 362, 394), without prejudice.

An Order follows, consistent with this Memorandum Opinion.

Date: June 21, 2021 /s/
Ellen L. Hollander
United States District Judge